`IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 10, 2021

## STATE OF TENNESSEE v. ARNOLD DRAPER SHAWELL

**Appeal from the Criminal Court for Davidson County
No. 2017-C-1581    Monte Watkins, Judge**

_____

### No. M2021-00507-CCA-R3-CD

_____

Following a jury trial, Arnold Draper Shawell ("Defendant") was convicted of aggravated robbery, evading arrest, and possession of drug paraphernalia, for which he received an effective sentence of twelve years' incarceration. On appeal, Defendant contends that the evidence presented at trial was insufficient to support his conviction for aggravated robbery and that the trial court committed plain error by allowing the State to cross-examine him about a robbery conviction from 1991 for the purposes of impeachment. Following a thorough review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J. ROSS DYER, JJ., joined.

Manuel B. Russ (on appeal), Marie Stacey (at sentencing), Jay Moreland and Sean McKinney (at trial), Nashville, Tennessee, for the appellant, Arnold Draper Shawell.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Marcus Floyd, Tee Hassold, and Kristen Kyle-Castelli, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### Factual and Procedural Background

At trial, Ryan Douglas Moss testified that, on May 12, 2017, he lived in an apartment building near Municipal Auditorium in downtown Nashville and that, around 9:00 or 10:00 p.m., he went to a bar on Church Street, about a mile from his apartment.

Mr. Moss said that he drank beer while at the bar and that he left at closing time. When asked if he was intoxicated when he left the bar, Mr. Moss stated, "I am sure I was, but not to the point of, like, I couldn't handle myself. I wouldn't have decided to walk home if I thought I had had too much." Mr. Moss testified that, as he was walking across the Church Street bridge, a black man of medium build wearing baggy clothes came up to him and "showed [him] a gun[.]" Mr. Moss stated, "It was a black gun, and -- it wasn't pointed at me, necessarily. But it was held out, like: 'I have this, I have a weapon,' basically." Mr. Moss gave the man his wallet, and the man "disappeared."

Mr. Moss testified that he did not recognize the man and that he could not recall if the man said anything to him. Mr. Moss explained that he gave the man his wallet because the man showed him the gun and Mr. Moss thought he would be shot if he did not turn over the wallet. Mr. Moss recalled that, after the incident, he alerted an employee at a nearby pizza restaurant. Mr. Moss stated that his wallet was eventually recovered by police and returned to him. He said that he checked the wallet and found nothing missing.

On cross-examination, Mr. Moss stated that he had been at the bar drinking for about four hours before it closed. When Mr. Moss was asked how drunk he was, he responded, "I remember walking part of the time and I blacked out mostly, probably, out of panic of some kind, and because my adrenalin was, probably, going, and because I did have some drinks. But I don't know. I felt okay." He said that he did not recall telling police that he was coming out of some bushes right before the robbery.

Sergeant Jonathan Frost of the Metro-Nashville Police Department (MNPD) testified that he was on duty the early morning of May 13, 2017, and that he stopped at Sicilian Pizza on Church Street for his lunch break with fellow officers, Sergeant Harrison Dooley and Sergeant Chad Young. Sergeant Frost continued:

> We had just finished up eating at the Sicilian Pizza [r]estaurant. And several of the employees from the restaurant, when we were walking out, approached us and advised that [Mr. Moss] had just been robbed, across the street. And then, [Mr. Moss] came to us and said he had been robbed and gave us a very brief description.

Mr. Moss told Sergeant Frost that the suspect was a "black-male, wearing dark clothing, with a black gun." Mr. Moss and some of the restaurant employees pointed towards Ninth Avenue North, indicating the suspect's direction of travel. Sergeant Frost testified that he immediately ran in the same direction. Sergeant Frost saw "a male-black with dark clothing" running down the street about fifty to seventy-five yards away. Sergeant Frost gave loud verbal commands to the suspect, identifying himself as a police officer and ordering the suspect to stop running.

- 2 -

Sergeant Frost testified that he began chasing the suspect "[w]ithin seconds" of the robbery. He said that he did not see anyone else on the street as he pursued the suspect. Sergeant Frost described the route that he ran while chasing the suspect and explained, "[A]s soon as he rounded the corner, underneath this overpass, that [was] when Sergeant Dooley and Sergeant Young were on the opposite side of that wall. And that [was] when [Defendant] was taken into custody." Sergeant Frost agreed that a black gun and Mr. Moss's wallet were found at the time of Defendant's arrest and that the wallet was returned to Mr. Moss. Sergeant Frost said that Mr. Moss, who was "fairly inebriated[,]" told officers that the robbery occurred when he was coming out of some bushes where he had been urinating.

Sergeant Chad Young of the MNPD testified that, around 3:30 a.m. on May 13, 2017, he and Sergeants Frost and Dooley were walking out of Sicilian Pizza on Church Street when they were approached by "employees of the Sicilian stating that a robbery had just occurred[.]" Sergeant Young recalled that they went outside and spoke to Mr. Moss, who stated that he had just been robbed "while he was trying to urinate in the bushes at Ninth and Church" by "a male-black with a black handgun . . . wearing a hood[ie.]" Mr. Moss pointed up the street towards Ninth Avenue, and Sergeant Frost immediately ran in that direction. Sergeant Young explained that he and Sergeant Dooley ran "down YMCA Way in hopes of paralleling Sergeant Frost." Sergeant Young testified that, "within seconds[,]" Sergeant Frost advised over his radio that he saw someone matching the suspect's description running down Ninth Avenue. Sergeant Young said that, as he and Sergeant Dooley were running down YMCA Way, they encountered Defendant as Defendant came around the corner. Sergeant Young said:

> Knowing that [Defendant] was to have a gun[,] I pulled my gun and gave him commands to let me see his hands, at which time, he had his hands . . . in the front, kind of, belt area, he quickly put his hands up in the air. During that time[,] I noticed a dark object. I couldn't tell what it was. It was dark outside. A dark object in his hands, but when he had put his hands up[,] he was tossing the object. And then I heard that object hit the ground.

Sergeant Young estimated that less than a minute had elapsed from the time he exited the restaurant until he encountered Defendant. He said that the object Defendant tossed was a black handgun but that it was not real; it was a BB gun. Sergeant Young stated that he could not tell if the gun was real when he first saw it on the ground beside Defendant.

Sergeant Young said that, when they took Defendant into custody, Defendant had Mr. Moss's wallet in his left hand. In a search of Defendant, officers found a cigarette box that contained a crack pipe. Sergeant Young described the crack pipe as a glass pipe with "burn marks on it" and a filter on one end. Sergeant Young, who had been a narcotics

detective with the MNPD for six years, stated that, based on his knowledge and experience, the glass pipe collected from Defendant had been used for smoking crack cocaine.

Sergeant Young explained that, as officers placed Defendant in the back of the patrol car, he advised Defendant of his *Miranda* rights. Defendant said that he understood his rights and that he wished to speak to Sergeant Young. Sergeant Young testified:

> I told [Defendant] that Mr. Moss was accusing him of robbing him while he was trying to urinate in the bushes[,] and [Defendant] stated that Mr. Moss was actually trying to buy drugs from [Defendant] and that he robbed [Mr. Moss] because of his crack cocaine addiction. And [Defendant] admitted to displaying the gun during the incident.

Sergeant Young said that Defendant was remorseful and wanted to apologize to Mr. Moss. Defendant told Sergeant Young that he "had a crack cocaine addiction" and that he "needed help[.]"

On cross-examination, Sergeant Young agreed that it was apparent that Mr. Moss was intoxicated at the time of the robbery. He could smell alcohol on Mr. Moss, and Mr. Moss's speech was slightly slurred.

MNPD Sergeant Harrison Dooley testified that he was with Sergeants Young and Frost at Sicilian Pizza on May 13, 2017, when they were alerted about an incident outside by a delivery driver for the restaurant. The officers stepped outside and spoke to Mr. Moss who explained that he had just been robbed. Mr. Moss gave a brief suspect description and account of what happened. He said that the suspect was a black man wearing a hoodie and informed the officers that the suspect was armed with a gun. Sergeant Dooley explained that, as Sergeant Frost ran along Ninth Avenue after the suspect, he and Sergeant Young proceeded down YMCA Way. As Sergeant Dooley ran, he could hear Sergeant Frost giving commands to the suspect to stop. Sergeant Dooley said that he saw no one else out in the area at that time of morning.

Sergeant Dooley testified that he and Sergeant Young encountered Defendant in an area underneath an overpass and that they ordered Defendant to the ground at gun point. He said that, before Defendant complied, Defendant threw an object from his waistband that landed about two feet away from Defendant. As Sergeant Dooley placed Defendant in handcuffs, he saw that the object appeared to be a gun. Sergeant Dooley stated that the gun looked real and that he did not realize it was a fake gun until he collected it.

- 4 -

On cross-examination, Sergeant Dooley said that he was unsure if the employees of Sicilian Pizza witnessed the robbery and that he was unaware of any official statements given to police by the employees.

Defendant testified that he was fifty-four years old and that he owned a small landscaping business with his brother. He said that, in the early morning hours of May 13, 2017, he drove his girlfriend to her home in his Silverado truck. He said that he had a BB gun in his truck that he used while at work to shoot snakes he encountered. Defendant said that, on the way back to his house, he decided to drive through downtown Nashville but that he got lost because he was not familiar with the streets. Defendant said, as he was driving, he saw "the gold arches" and wanted a hamburger and fries, so he parked his truck on Ninth Avenue by the YMCA and got out of the truck to walk to McDonald's. He said that he was carrying his BB gun because he had been robbed previously.

Defendant testified that, as he walked towards McDonald's, he encountered Mr. Moss. Defendant said:

> And [Mr. Moss] just jumps out of the bushes on me. And his pants is [sic] half down. And looked like he, kind of, urinated on hisself [sic]. And he startled me. And I jumped back. And once I jumped back, I guess, he, kind of, wigged out. I don't know. He just started all kinds of mumbo jumbo. "Yep, yep, you gotta" and next thing I know he is throwing his wallet.

Defendant said that Mr. Moss ran from him and that he picked up the wallet but did not take anything out of it. Defendant stated, "And [I] opted to go back to my vehicle and get out of this here situation because it didn't seem comfortable to me." Defendant testified that, when Mr. Moss jumped out of the bushes, Defendant was scared. However, Defendant denied that he pulled out or showed Mr. Moss the BB gun; he said that the BB gun remained in his front pocket during the encounter.

Defendant agreed that he was arrested minutes after his interaction with Mr. Moss and that he tossed the BB gun. Regarding the officers' claims that Defendant ran from them, Defendant testified, "I walked fast from that situation. But I have a total knee replacement. And this thing is botched and jammed up. And so I -- if I take too fast of a step anywhere it pops out. So, I am not running [any]where." Defendant denied telling Sergeant Young that he displayed the BB gun to Mr. Moss. When asked how he felt after he was placed in handcuffs, Defendant responded, "I tried to get the logistics of what it was that this sergeant was saying to me about, you know, me robbing this guy, and the, you know, all this stuff. And I am, like, I've never robbed anybody at all."

During an in-chambers conference, the State requested that it be allowed to cross-examine Defendant about a 1991 robbery conviction from Pennsylvania. The State argued that Defendant "opened the door" when he testified that he "never robbed anybody at all." Defense counsel objected, stating, "Judge, I don't think [Defendant] said 'in his life.'" The following exchange then occurred:

THE COURT: Well, he said he'd never robbed "anybody." That's in his life.

[DEFENSE COUNSEL]: I think, in the context, he meant that night I've never robbed anybody.

THE COURT: Well --

[THE STATE]: And it is the State's position that he opened the door.

THE COURT: Well, he did. If he has a prior robbery[,] he opened that door.

On cross-examination, Defendant said that he did not know why he picked up Mr. Moss's wallet. He said that he told the officers that Mr. Moss jumped out of the bushes and startled him. When Defendant was asked about his statement on direct examination that he had "never robbed anybody," the following exchange occurred:

[THE STATE:] Isn't it true that you have previously been convicted of robbery?

[DEFENDANT:] What you talking about, Big Guy?

[THE STATE:] Is it true that you have previously been convicted of robbery in Pennsylvania?

[DEFENDANT:] Previously?

[THE STATE:] Yes, sir.

[DEFENDANT:] Many, many, many years ago.

[THE STATE:] Okay.

[DEFENDANT:] Nineties.

- 6 -

Following deliberations, the jury found Defendant guilty of aggravated robbery, evading arrest, and possession of drug paraphernalia. The trial court sentenced Defendant to serve concurrent sentences of twelve years for aggravated robbery, eleven months and twenty-nine days for evading arrest, and eleven months and twenty-nine days for possession of drug paraphernalia. The judgments of conviction were entered on September 14, 2018.

On January 9, 2019, Defendant filed a pro se "Petition for Appointment of Counsel," which the trial court granted on March 11, 2019. On March 12, 2019, Defendant, through appointed counsel, filed a "Motion to Allow Late-Filed Motion for New Trial." Following a hearing, the trial court denied the motion and appointed new counsel to represent Defendant on appeal. On May 12, 2021, Defendant filed an untimely notice of appeal. Defendant subsequently filed a motion to accept the late-filed notice of appeal, which this court granted.

## Analysis

### *Sufficiency of the Evidence—Aggravated Robbery*

Defendant contends that the State produced insufficient evidence as to the offense of aggravated robbery for any reasonable juror to find Defendant guilty beyond a reasonable doubt.[1] Defendant argues that Mr. Moss was intoxicated and had trouble recalling details of his interaction with Defendant and asserts that it was "more plausible to believe that [Mr. Moss] surrendered his wallet without demand while drunk and he failed to recall the details than [that Defendant] robbed him then immediately confessed as such to the arresting officers."

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder, and this court will not reweigh the evidence. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

---

[1] Defendant does not challenge the sufficiency of the evidence as it relates to his convictions for evading arrest and possession of drug paraphernalia.

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *Bland*, 958 S.W.2d at 659; *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

As charged here, aggravated robbery is a robbery that is "[a]ccomplished with a deadly weapon or by display of any article used or fashioned to lead the victim to reasonably believe it to be a deadly weapon[.]" Tenn. Code Ann. § 39-13-402(a)(1) (2017). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (2017).

In this case, Mr. Moss testified that, as he was walking home from a bar, a black male of medium build wearing baggy clothes came up to him and "showed [him] a gun[.]" Mr. Moss said that he thought he would be shot if he did not turn over his wallet, so he gave the man his wallet, and the man "disappeared." Mr. Moss then alerted an employee at Sicilian Pizza that he had just been robbed.

Sergeant Frost testified that, as he and Sergeants Young and Dooley were leaving Sicilian Pizza, employees from the restaurant "advised that [Mr. Moss] had just been robbed, across the street." Mr. Moss gave the officers a brief description, stating that the suspect was a "black-male, wearing dark clothing, with a black gun." Mr. Moss pointed in the direction that the suspect traveled, and Sergeant Frost immediately ran in the same direction. When he got to the intersection, Sergeant Frost saw a man matching Mr. Moss's description running down the street about fifty to seventy-five yards away. Sergeant Frost gave loud verbal commands, identifying himself as a police officer and ordering the suspect to stop. Sergeant Frost said that he did not see anyone else on the street as he pursued the suspect.

Sergeant Young testified that he and Sergeant Dooley ran up a street that paralleled the street where Sergeant Frost was chasing the suspect. Sergeant Young and Sergeant Dooley intercepted Defendant and ordered him to the ground at gunpoint. Before putting his hands into the air, Defendant tossed a black BB gun to the ground from his waistband. Sergeant Young said that he could not tell whether the BB gun was a real gun when he saw it on the ground beside Defendant. Sergeant Dooley testified that the gun looked real and that he did not realize it was a fake gun until he picked up the object.

When officers arrested Defendant, Defendant was holding Mr. Moss's wallet in his left hand. During a search of Defendant, they found a crack pipe inside a cigarette box.

Sergeant Young advised Defendant of his *Miranda* rights, and Defendant said that he understood his rights and that he wished to speak to Sergeant Young. Defendant told Sergeant Young that he "had a crack cocaine addiction." Defendant said that he robbed Mr. Moss because of his crack cocaine addiction, and he admitted to displaying the BB gun during the incident.

Viewing the evidence in the light most favorable to the State, any rational juror could have found the essential elements of aggravated robbery beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. Defendant's argument that his testimony was "more plausible" than that of Mr. Moss and Sergeants Frost, Young, and Dooley essentially invites this court to reweigh the evidence, which we cannot do. *See Bland*, 958 S.W.2d at 659. Defendant is not entitled to relief on this claim.

### *Impeachment with Prior Conviction*

Defendant further contends that the trial court committed plain error by permitting the State to impeach Defendant with the otherwise inadmissible 1991 robbery conviction based on the trial court's finding that Defendant "opened the door." Defendant asserts that his statement that he "never robbed anybody at all" did not permit impeachment with this prior conviction, arguing that "the context of [Defendant's] statement was misconstrued" by the trial court and that Defendant "did not indicate that he had never robbed anyone in his lifetime, simply that he had never robbed anyone in the incident with Mr. Moss." Defendant also contends that, even if he did open the door, the evidence of the prior conviction was substantially more prejudicial than probative and should have been excluded on this basis. He argues that the jury likely decided that his prior robbery conviction "was an adequate basis for their finding of guilt on his present charge rather than the evidence adduced in court by the State."

As acknowledged by Defendant, his failure to raise this issue in a timely motion for new trial waives plenary review of the claim. *State v. Bough*, 152 S.W.3d 453, 460 (Tenn. 2004) ("If a motion for new trial is not timely filed, all issues are deemed waived except for sufficiency of evidence and sentencing."). However, this court may consider an error as "plain error" under Rule 36(b), if the error affected the substantial rights of an accused and if recognition of the error is necessary to do substantial justice. Tenn. R. App. P. 36(b). Plain error has been characterized as error that is obvious or egregious and has been "limited to those [errors] so objectionable that they should have been apparent to the trial judge or that strike at the fundamental fairness, honesty or public reputation of the trial." *United States v. Rodriguez*, 882 F.2d 1059, 1064 (6th Cir. 1989).

In *State v. Adkisson*, 899 S.W.2d 626 (Tenn. Crim. App. 1994), this court listed five factors to be applied to determine when alleged trial error constitutes plain error:

1) the record must clearly establish what occurred at trial; 2) a clear and unequivocal rule of law must have been breached; 3) a substantial right of the accused must have been adversely affected; 4) the accused did not waive the issue for tactical reasons; and 5) consideration of the error is "necessary to do substantial justice."

*Id.* at 641-42. In *State v. Smith*, 24 S.W.3d 274 (Tenn. 2000), our supreme court "formally" adopted this analysis, stating that "the *Adkisson* test provides a clear and meaningful standard for considering whether a trial error rises to the level of plain error in the absence of an objection." *Smith*, 24 S.W.3d at 282-83. In applying the *Adkisson* test, the *Smith* court stated:

> We re-emphasize that the presence of all five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established. In addition, the "'plain error' must [have been] of such a great magnitude that it probably changed the outcome of the trial."

*Smith*, 24 S.W.3d at 283 (quoting *Adkisson*, 899 S.W.2d at 642). In *State v. Thomas*, our supreme court stated that, ultimately, a trial error must have had "an unfair prejudicial impact which undermined the fundamental fairness of the trial." 158 S.W.3d 361, 413 (Tenn. 2005) (citing *Adkisson*, 899 S.W.2d at 642).

Here, the trial court found that, although the prior robbery conviction did not meet the criteria established for impeachment by evidence of a prior conviction under Tennessee Rule of Evidence 609,[2] Defendant opened the door to the impeachment when he testified that he had "never robbed anybody at all." *See State v. Gomez*, 367 S.W.3d 237, 246 (Tenn. 2012) (stating that, "[e]ven if evidence is inadmissible, a party may 'open the door' to admission of that evidence"). Our supreme court has explained, "When a party raises a

---

[2] According to this rule, prior adult convictions may be used to impeach a defendant if:

(a) the conviction is for a crime punishable by death or imprisonment in excess of one year, or the conviction is for a misdemeanor which involved dishonesty or false statement; (b) less than ten years have elapsed between the date the accused was released from confinement and the commencement of the subject prosecution; (c) the State gives reasonable pretrial written notice of the particular conviction or convictions it intends to use as impeachment; and (d) the trial court concludes that the probative value of the prior conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues.

*State v. Mixon*, 983 S.W.2d 661, 674 (Tenn. 1999); *see also* Tenn. R. Evid. 609.

subject at trial, the party 'expand[s] the realm of relevance,' and the opposing party may be permitted to present evidence on that subject." *Id.* (quoting 21 Charles Alan Wright et al., *Federal Practice & Procedure Evidence* § 5039.1). In *State v. Kendricks*, 947 S.W.2d 875 (Tenn. Crim. App. 1996), this court held that "'[i]rrespective of admissibility under Rule 609 [of Tennessee Rules of Evidence], a conviction may be used to contradict a witness who "opens the door" and testifies on direct examination that he or she has never been convicted of a crime, or to counter some other facet of direct testimony.'" (quoting Neil P. Cohen et al., *Tennessee Law of Evidence* § 609.1 (3d ed. 1995)).

In ruling on the issue, the trial court determined that Defendant's testimony that he had never robbed "anybody" meant or included "in his life," and the court allowed the State to impeach Defendant's testimony "on direct as being less than forthright." *Id.*; *see also State v. Brian Jermaine Dodson*, No. M2011-00523-CCA-R3-CD, 2012 WL 2403624, at *15-17 (Tenn. Crim. App. June 27, 2012) (concluding that the trial court did not abuse its discretion when it allowed defendant to be impeached with prior assault convictions after the defendant testified, "I'm not that type of person"), *perm. app. denied* (Tenn. Oct. 17, 2012). Moreover, because Defendant testified that he had never robbed anyone, the probative value of his prior robbery conviction "increased appreciably[,]" *see State v. Jeffrey L. Vaughn*, No. W2012-01987-CCA-R3-CD, 2013 WL 1282331, at *9 (Tenn. Crim. App. Mar. 28, 2013) (holding that the probative value of the defendant's 1990 conviction for drug dealing "increased appreciably" after the defendant testified under oath that he did not sell drugs), *perm. app. denied* (Tenn. Sept. 25, 2013), and the State only briefly questioned Defendant about the prior robbery conviction, thereby limiting its prejudicial effect. *See* Tenn. R. Evid. 403.

We conclude that no clear and unequivocal rule of law was breached when the trial court determined that the State could impeach Defendant's testimony with his 1991 robbery conviction. *Adkisson*, 899 S.W.2d at 641-42. Accordingly, Defendant is not entitled to relief under plain error. *Smith*, 24 S.W.3d at 283.

## Conclusion

Based on the foregoing reasons, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE

- 11 -